United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIRECTV, Inc., <br><br> Plaintiff, <br><br> v. <br><br> HOA HUYNH, <br><br> Defendant. _____/ | No. C 04-3496 CRB <br><br> **MEMORANDUM AND ORDER GRANTING MOTION TO ENTER DEFAULT JUDGMENT** |

Currently pending before this Court are several motions for default judgment in cases brought by DirecTV, Inc. ("DirecTV") against individuals that it alleges have illegally intercepted its satellite broadcasts of television programming. These cases represent only a tiny fraction of cases filed by DirecTV in district courts nationwide against alleged pirates. In nearly all of these cases, DirecTV alleges that the defendants bought devices used either to emulate or reprogram DirecTV access cards in order to illegally receive plaintiff's satellite programming. The complaints further allege that the defendants in fact used these "pirate access devices" to those ends and did receive such programming.

Subsequent to the entry of defaults in these cases by the clerk, the Court conducted an evidentiary hearing on March 17, 2005 in which DirecTV offered expert testimony supporting the inference that the defendants' purchase of the pirate access devices establishes that they illegally intercepted DirecTV's signal.[1] The Court also considered argument by

---

[1] The transcript of this testimony is attached hereto as Exhibit A to this Memorandum.

amicus curiae the Electronic Frontier Foundation ("EFF"), which expressed concern at what they contend is plaintiff's attempt to infer unlawful conduct from the lawful purchase of technology that has both illegitimate and legitimate uses.[2] Having carefully considered all of the positions presented, the Court has determined that it should enter default judgment and award damages as detailed below.

## BACKGROUND

**A.  DirecTV**

Plaintiff DirecTV provides satellite television programming on a subscription and pay-per-view basis to over 13 million paying customers.  In order to become a DirecTV customer, an individual must purchase the appropriate hardware, including a DirecTV satellite dish and an integrated receiver decoder ("receiver").  The satellite dish receives encrypted signals from DirecTV's orbiting satellites and sends the signal to the receiver, which decrypts the signal and transmits it to the consumer's television.

Inserted into the receiver is a removable credit-card sized device containing two microchips called a "conditional access module" and commonly referred to as a smart card.  Smart cards are essentially miniature computers containing their own software and memory.  They are used in a number of applications, including as phone cards, personal identification cards and gift cards.  DirecTV's smart cards contain data identifying the particular customer and the subscription package purchased.  Using this information, the smart card tells the receiver which channels the receiver may and may not decrypt.  DirecTV pirates were able to exploit this system by reprogramming DirecTV smart cards to unlock all of DirecTV's channels regardless of whether the user had paid for them.  A related piracy strategy involved replacing the smart card entirely with a machine that would tell the receiver to decrypt channels without payment.

---

[2]  EFF also raised concerns regarding what they characterize as manipulative misrepresentations made by DirecTV in demand letters sent to suspected pirates. The propriety of such practices are, of course, not before this Court and therefore have not been considered here. But see Blanchard v. DirecTV, Inc., 123 Cal.App.4th 903 (Cal. Ct. App. 2004) (affirming dismissal of class action brought by DirecTV demand letter recipients alleging unfair business practices and extortion).

2

When DirecTV first became aware of these strategies, it invested in anti-piracy technology. For example, DirecTV's satellites broadcasted electronic countermeasures that disabled illegally reprogrammed smart cards. However, soon after the countermeasures were implemented, pirates were able to develop software patches that repaired access cards disabled by them. Therefore, for those pirates who knew of these fixes and were willing and able to apply them, the electronic countermeasures were only successful in temporarily discontinuing their illegal access to DirecTV.

The most effective countermeasure--dubbed "Black Sunday" by pirates--was originally believed by DirecTV to permanently disable a large proportion of illegally programmed smart cards. However, only three weeks after implementation of that countermeasure, new hardware and software emerged on pirate websites that was able to repair and reprogram smart cards effected by Black Sunday.

## B.  Pirate Access Devices

In order to illegally receive DirecTV, pirates have employed various devices. Because of the widespread use of smart card technology, some of the devices labeled by DirecTV as "pirate access devices" may have legitimate uses separate from stealing DirecTV's programming. DirecTV's experts have highlighted for the Court the specific attributes of the equipment at issue in these lawsuits that make DirecTV confident that they were in fact purchased for the sole purpose of illegally descrambling DirecTV's signal. Those devices identified by plaintiff as pirate access devices are marketed as "unloopers," "bootloaders," "emulators," and "reader/writers."

Products marketed as "unloopers" and "bootloaders" are specialized smart card programmers that are effective in repairing smart cards damaged by DirecTV's electronic countermeasures. Unloopers[3] are constructed in a manner so specific to DirecTV piracy as to create a strong presumption that an individual who buys the device is using it for that

---

[3]DirecTV presented the Court with expert evaluations of unloopers marketed under several names, including "Whiteviper Super Unlooper," "Whiteviper UnlooperX," "KAC Unlooper," "Dual Pro All In One," "Terminator Unlooper," "Vector Fusion," and "MKII Unlooper." Each of these devices have substantially the same design and capacities with respect to DirecTV piracy.

3

purpose. First, unloopers apply a lower power supply to smart cards inserted into them than any other devices used to read, program or reprogram smart cards. The purpose of providing a lower voltage supply is to alter the processor on the smart card in a manner that is useful in satellite piracy. DirecTV's experts have not been able to locate any other smart card application that is compatible with the unlooper's unique power supply system. Indeed, the unlooper's power system violates the universal standard for smart card devices and therefore is likely to damage smart cards that are used with it. A second attribute indicating use for piracy is that many unloopers are sold with microchips containing software which has no other use than to reprogram DirecTV's access cards in order to steal DirecTV.[4] Finally, a third indication is that unloopers are compatible with and recognized by software applications available on the internet which have the sole use of reprogramming DirecTV smart cards for the purpose of piracy. Together, these three attributes make an individual's possession of an unlooper highly suggestive of satellite piracy.

An "emulator" is a circuit board that is manufactured to be the same size and shape as a smart card, as well as to have the same external components.[5] Because of this design, emulators can be inserted into a DirecTV receiver in place of a smart card. While inserted, an emulator can be connected to a personal computer. The user can then, through the emulator, apply software applications from the computer to the DirecTV receiver to decrypt all of DirecTV's channels.

Nothing about this structure is necessarily suggestive of use for satellite piracy. However, DirecTV identifies other emulator attributes which it contends indicates illegal use. Like smart cards, emulators have external metal contact points that connect to corresponding contact points on the inside of a DirecTV receiver in order to transmit information between the two. Unlike most smart card receptacles, DirecTV receivers are designed such that smart

---

[4] For example, the MKII Unlooper was sold with firmware called "WTXBS," which stands for "Wild Thing Version X--Black Sunday." This software has no other use than pirating DirecTV's satellite signal.

[5] DirecTV's experts presented evaluations of devices marketed as a "Cobalt Emulator" and a "Vector Emulator." These devices are similar in their electrical design and capabilities.

4

cards should be inserted into them with the metallic contact points facing downward. Most other smart card devices are made for the card to be inserted with the contact points facing upward or sideways. Emulators are designed to be compatible with DirecTV's atypical insertion design. Some of them contain a "This Side Up" instruction on one side, such that when they are inserted consistent with the instruction, the contact points face downward.[6] Therefore, because emulators share this unique quality with DirecTV's equipment, possession of an emulator suggests use for piracy. In addition, the emulators were advertised by pirate websites in a manner that indicated they had the ability to pirate DirecTV's signal. However, because DirecTV's receiver design is not wholly unique, and because a user could easily purchase an emulator and not heed the "This Side Up" instruction, emulators may possess some legitimate uses.

A smart card reader/writer is, quite intuitively, a device that allows the user to read and reprogram the software contained on a smart card.[7] Similar to emulators, those smart card reader/writers that were sold on pirate device websites contain some indication that they were used for DirecTV piracy. Many reader/writers used for legitimate uses contain a switch that detects the insertion of a smart card. The switch is useful for smart cards used for identification purposes, because it allows insertion of the card alone to initiate a log-in sequence rather than requiring the user to take the extra step of manually notifying the computer when the card has been inserted. Those reader/writers that DirecTV has identified as having been marketed and used for piracy do not contain this switch, and therefore do not have the functionality of more widely-used reader/writers. In addition, reader/writers used for DirecTV piracy were designed to have smart cards inserted into them with the contacts facing downward. Therefore, like emulators, possession of reader/writers is indicative (though not conclusively) of satellite piracy.

/ / /

/ / /

---

[6] The "This Side Up" instruction is contained only on the Vector Emulator.

[7] Plaintiff presented as an example a "White Viper Reader/Writer."

5

### C. Other Evidence of Piracy

In addition to features inherent in the technology itself, DirecTV identified potential satellite pirates from other circumstantial evidence. Pirate access devices were sold on the internet by retailers such as "White Viper Technologies," "cansat2000," "Kick Ass Clones," and "Vector Technologies." DirecTV was able to identify individuals who were potentially using pirate access devices after executing searches of sales records held by these companies. For example, in the instant case DirecTV discovered that the defendant purchased an unlooper and a reader/writer from the website of White Viper Technologies for approximately $300. The White Viper website contained links to other internet pages which provided instructions on how to program DirecTV access cards for the purpose of piracy.

Once obtaining purchase records from pirate access device producers, DirecTV would also make attempts to cross-reference the lists with their own subscription lists. A customer who had once held a DirecTV subscription was likely to still possess the equipment necessary to receive DirecTV's signal. Here, for example, the address at which Mr. Huynh received the pirate access devices was found in DirecTV's database as the address of a DirecTV subscriber from August 1998 to August 2000. The record also shows that Mr. Huynh purchased the pirate access devices in November 2000.

DirecTV's searches also revealed the e-mail addresses of pirate access device customers. DirecTV cross-referenced that information with data it possessed containing e-mail addresses of individuals who had participated in internet bulletin boards used to discuss DirecTV piracy. Mr. Huynh, for example, was connected to an e-mail address that was associated with seven different piracy web forums.

### D. DirecTV's Losses

DirecTV's revenue losses from piracy are made up of two main components. First, DirecTV spends money on anti-piracy efforts. Second, individuals who illegally obtain DirecTV's signal without payment might otherwise have become paying customers.

In addition to the money it spends investigating and litigating piracy claims, DirecTV's anti-piracy campaign also includes inventing and implementing technological

hurdles to satellite theft. Besides the money spent on electronic countermeasures, DirecTV also has repeatedly altered its smart cards in hopes of making them impervious to piracy. These efforts were ultimately successful with DirecTV's invention of a fourth-generation smart card in 2000. By April 2004, DirecTV was able to discontinue signal streams accessible to the first three generations of access cards, thereby (as far as is known by DirecTV) finally extinguishing the efficacy of pirate access devices. These efforts, though ultimately effective, came at a great expense. For example, DirecTV spent $22 million developing and implementing the technology to move from the third-generation smart card to the fourth-generation card.

DirecTV's lost subscription revenues are much harder to quantify. The retail value of all the programming a DirecTV pirate has access to exceeds one million dollars per year. Of course, it would be impossible for an individual to view all of that programming and improbable that they would view even a fraction of it, since DirecTV typically airs repeat broadcasts of the same pay-per-view movie several times. Moreover, because satellite pirates are able to receive all the television they want without incurring any marginal cost for increased viewing, they likely consume much more television than they would if they had to pay for it. Indeed, it is likely the case that some pirates would never have subscribed to DirecTV at all if they had to pay for it. Thus, there is no satisfactory mechanism for setting the subscription losses to DirecTV. For its part, plaintiff relies on a trade publication that estimates its programming revenue losses at one billion dollars per year--a significant portion of their 2004 gross revenue of eight billion dollars.

Losses in subscription fees not only reduce DirecTV's total revenues directly but also endanger the company's relations with its programming providers. DirecTV does not produce or own any of the intellectual property that it broadcasts. Rather, it purchases programming directly from copyright holders, and also pays royalties to them based on the subscription fees they collect. Many of these programming suppliers have voiced serious concerns over the problem of satellite piracy, as it results in lost income for them as well.

///

**PROCEDURAL HISTORY**

All DirecTV cases in this district were originally referred to Judge James Ware to make a limited determination as to whether the actions should be joined. See In re DirecTV, Inc., No. C-02-5912-JW (July 26, 2004). In an order dated July 26, 2004, Judge Ware determined that the actions should not be joined, and ordered DirecTV to re-file the cases as separate actions against separate defendants. In that order, Judge Ware also examined the showing necessary for plaintiff to establish a prima facie case under each of the statutory claims pled.

The complaint in the present action against Mr. Huynh was filed on August 23, 2004. Defendant was served on October 24, 2004. Plaintiff moved for entry of default on November 30, 2004 and the default was entered by the clerk on December 1, 2004. Plaintiff now moves for entry of default judgment.

**JURISDICTION**

When a court is considering whether to enter a default judgment, it has "an affirmative duty to look into its jurisdiction over both the subject matter and the parties." In re Tuli, 172 F.3d 707, 712 (9th Cir. 1999) ("To avoid entering a default judgment that can later be successfully attacked as void, a court should determine whether it has the power, i.e., the jurisdiction, to enter the judgment in the first place."). Here, personal jurisdiction was established when defendant was served in California. The Court has subject matter jurisdiction because the plaintiff's claims arise under the Federal Communications Act of 1934, 47 U.S.C. § 605, and the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. See 28 U.S.C. § 1331. The Court also has supplemental jurisdiction over plaintiff's claim arising under state law. See 28 U.S.C. § 1367.

**DISCUSSION**

The complaint alleges that defendant purchased a "Viper Super Unlooper" and a "Viper Reader/Writer" from White Viper. Plaintiff pleads causes of action based on 18 U.S.C. § 2520(a); 47 U.S.C. § 605(e)(4), 47 U.S.C. § 605(a) and California common law.

8

Plaintiff seeks $20,000 in damages pursuant to the damages provisions associated with sections 2520(a), 605(e)(4), and 605(a).

## A. Legal Standard

The decision whether to enter a default judgment lies within the district court's discretion. Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980). Upon entry of default, the factual allegations of the complaint that establish the defendant's liability are accepted as true, except for those regarding damages. TeleVideo Systems, Inc. v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987); Fed. R. Civ. P. 8(d). "Even after default, however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." 10A Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2688, at 63 (1998); see also, Quirindongo Pacheco v. Rolon Morales, 953 F.2d 15, 16 (1st Cir. 1992) (per curiam) (despite the admissions upon default, the court always has the power to require additional proof of any fact alleged as the basis for liability).

In exercising discretion to grant default judgment, the court may consider several factors:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

## B. 18 U.S.C. § 2520

### 1. Liability

The Electronic Communications Privacy Act, often referred to as the Federal Wiretap Act, imposes criminal liability for any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." See 18 U.S.C. § 2511(1)(a). Section 2520(a) authorizes a civil action to be commenced by any person whose:

> electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person . . . which engaged in that violation such relief as may be appropriate.

18 U.S.C. § 2520(a).

Some courts have read the legislative history of the Wiretap Act to support the conclusion that satellite piracy is not encompassed within its scope. See, e.g., DirecTV, Inc. v. DeCroce, 332 F. Supp.2d 715, 720-21 (D.N.J. 2004). However, this Court is constrained to apply the law of the Ninth Circuit, which has held that "[a] person who views satellite television programming by use of a modified descrambler and a satellite dish 'intentionally intercepts' the satellite television signal, which is an 'electronic communication,'" United States v. Lande, 968 F.2d 907, 909 (9th Cir. 1992). Thus, the conduct alleged in the complaint falls within the scope of section 2511. Id. at 910.

The complaint alleges that defendant used pirate access devices to "decrypt and view" plaintiff's satellite television transmissions. This is sufficient to state a claim under section 2520(a). Mindful of the Eitel factors, particularly the strong evidence that the defendant used the pirate access devices to illegally intercept DirecTV's signal and that there is no indication that defendant's default is due to excusable neglect, the Court deems default judgment appropriate with respect to this cause of action.

2. Damages

The applicable damages provision of the Wiretap Act provides that "the court *may* assess as damages whichever is the greater of: (A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or (B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000." 18 U.S.C. 2520(c)(2) (emphasis added). The peculiar damages structure of section 2520(c)(2) provides the Court with discretion to either award the statutory sum or nothing at all. See DirecTV, Inc. v. Brown, 371 F.3d 814, 818 (11th Cir. 2004) (joining three other circuits in holding that award of damages is discretionary). However, the Court may not award any amount between those two figures. See DirecTV, Inc. v. Griffin, 290 F. Supp.2d 1340, 1347-48 n.28 (M.D. Fla. 2003).

10

DirecTV calculates its actual damages as the total value of programming, including subscription and pay-per-view charges, viewed by defendant. Under this understanding, DirecTV assumes that defendant's use matched that of the top 10% of DirecTV customers (i.e. that he would have incurred $204.56 per month in charges), and also assumes that defendant was successful in pirating DirecTV's signal from the date of purchase until the April, 2004 (1,274 days), when the pirate access devices he owns became obsolete. Based on these assumptions, plaintiff argues that its actual damages were $8,561.28.

Plaintiff also claims that defendant violated the statute for 1,274 days. Under subsection 2520(c)(2)(B) plaintiff would therefore be entitled to $127,400, which is of course greater than $10,000. Therefore, statutory damages, and the maximum sum that plaintiff could make a claim for under the Wiretap Act, amount to $127,400.

In exercising its discretion over the award of damages in this default setting, the Court finds fault in both of plaintiff's damages calculations. Both are based on several unprovable assumptions. DirecTV calculates actual damages based on an estimate of the amount of television consumed by defendant. However, this is contrary to the typical understanding of "actual damages" as losses suffered by the plaintiff. See Black's Law Dictionary, 8th ed., at 416 (defining "actual damages" as "amount awarded . . . to compensate for a proven injury or loss . . . . Also termed compensatory damages").[8] Defendant's benefit is a poor measure of plaintiff's actual losses since DirecTV's broadcasting costs are only marginally affected by a single pirate's illegal consumption of its programming. DirecTV's true actual damages from the individual pirate's activities should instead be measured by the total costs it has paid for anti-piracy efforts plus its total revenue losses divided by the total number of pirates. However each of these numbers is reducible to only a rough estimate and combining them would only compound their inaccuracy. The result of such a calculation could never withstand reasoned scrutiny.

---

[8] While the statute also provides that actual damages be added to "any profits made by the violator," 18 U.S.C. 2520(c)(2), this still does not support plaintiff's restitution-based method of calculating damages. Plaintiff does not contend that defendant received any "profits" from his interception of plaintiff's signal.

11

Even if the value of what defendant watched were an appropriate measure of actual damages, the Court would still be relying on speculation regarding the amount of programming defendant viewed and the number of days defendant was able to pirate the signal. DirecTV's assumption that defendant used $204.56 per month in services is not on its face unreasonable, particularly given that defendant spent $300 on the piracy devices. However, the assumption that defendant consumed this much television consistently for nearly three and a half years is not well-supported. Given that it made no difference in terms of cost for defendant to watch as much or as little television as he liked, the actual subscription charges he would have incurred may have been far greater or lesser than DirecTV's estimate. Moreover, there is little evidence that defendant was able to steal DirecTV programming for the entire period between his purchase of the devices until April, 2004. Not only does this calculation fail to allow time for shipping and installation, it also contradicts DirecTV's expert testimony that its electronic countermeasures at least temporarily disabled illegally reprogrammed smart cards. There is no reasonable way to ascertain whether defendant was technologically savvy enough to be able to continuously reprogram his smart card in order to continue receiving DirecTV's signal without significant interruption. Indeed, defendant may have never been able to operate the pirate access devices in the first place, or have abandoned their use once it became too difficult to find new software patches to overcome DirecTV's countermeasures.

Given these uncertainties, DirecTV's actual and per-day damage calculations have not been sufficiently supported. Therefore, these calculations are rejected, and instead the Court finds that 18 U.S.C. 2520(c)(2) provides for a damage calculation of the minimum statutory amount of $10,000. See 18 U.S.C. 2520(c)(2)(B).

The Court must next determine whether to award $10,000 or nothing at all. See Brown, 371 F.3d at 818. In making this determination, courts have examined several factors including: (1) whether the defendant profited from his violation; (2) whether there was any evidence that the defendant actually used his pirate access devices; (3) the extent of DirecTV's financial harm; (4) the extent of the defendant's violation; (5) whether the

defendant had a legitimate reason for his actions; (6) whether an award of damages would serve a legitimate purpose; and (7) whether the defendant was also subject to another judgment based on the same conduct. DirecTV, Inc. v. Huynh, 318 F. Supp.2d 1122, 1132 (M.D. Ala. 2004) (citations omitted). Some courts applying these criteria have found damages inappropriate, favoring instead assessment of damages under 47 U.S.C. § 605(a), which provides greater judicial discretion to set a particular damages amount. See DirecTV, Inc. v. Cain, No. 03-CV-5362, 2005 U.S. Dist. LEXIS 7404, *5 (D.N.J. April 20, 2005); DirecTV, Inc. v. Carpenter, No. 03-5247, 2005 U.S. Dist. LEXIS 5124, *11-12 (N.D. Cal. March 11, 2005).

      This Court takes a different view. The Wiretap Act essentially sets a statutory floor for damages at $10,000. However, the statute also makes the decision of whether or not to award damages subject to the court's discretion. While it may be appealing to dismiss this scheme as an anomaly, to do so would be to be to dismiss the fact that Congress affirmatively amended the statute to create it. See Brown, 371 F.3d at 817 (discussing how the 1986 amendments to the Act changed the text of damages provision from "shall" to "may."). "When Congress alters the wording of a statute, [the court] presume[s] that Congress intended a change in the law." Hiivala v. Wood, 195 F.3d 1098, 1103 (9th Cir. 1999).

      In requiring that courts award either award no damages or a particular amount of damages no less than $10,000, Congress may have anticipated that courts would be placed in the position of having to set damages without any satisfactory guidance rooted in the defendant's conduct or the harm to the plaintiff.[9] In response Congress provided a specific rule for damages calculation as well as a minimum damages amount of $10,000. The amount chosen reflects Congress's view of what level of damages provides a sufficient deterrent and

---

[9] Even if defendant had appeared in this action, plaintiff would still face an uphill battle proving the amount and duration of interception. See Gross v. Taylor, No. 96-6514, 1997 U.S. Dist. LEXIS 11657, *15 (E.D. Penn. 1997) (discussing "peculiar difficulties plaintiffs face in presenting evidence in wiretap claims"). In addition, because the statute provides for criminal and civil penalties, one might expect that in many civil Wiretap Act cases the defendant would invoke the Fifth Amendment privilege against self incrimination.

13

adequately compensates the plaintiff.[10] By adding to this a simple yes or no vote by the court, Congress has instructed courts to make a determination regarding the sufficiency of the case against defendant and the seriousness of the alleged conduct. Where the Court determines that such a threshold is met, it must award the particular amount determined by Congress, rather than engaging in the guesswork involved in gauging the defendant's culpability and the harm to the plaintiff based on minimal evidence and weak inferences.

Here, the Court faces significant uncertainty with respect to the seriousness of the interception perpetrated by defendant. However, the Court deems important the significant evidence DirecTV has produced of defendant's liability. Without having any access to defendant at all, plaintiff was able to determine that he terminated his DirecTV subscription just weeks before his purchase of the pirate access device and that he visited internet bulletin boards discussing techniques for pirating DirecTV. The record also reflects that defendant purchased an unlooper from White Viper. The Court finds this latter piece of evidence, by itself, creates a strong presumption that defendant illegally intercepted DirecTV's signal. The unlooper is so unique to DirecTV piracy that legitimate use of the device may only occur in the context of DirecTV's own investigations of piracy. Because unloopers are so uniquely engineered for DirecTV piracy, the fears expressed by EFF that a large damage award risks punishing ownership of a legal technology are alleviated. While there may be some theoretical legitimate uses of this technology, defendant's default means the Court need not entertain such theories.

Plaintiff has also made a considerable showing regarding the losses it has suffered due to pirate activities. DirecTV loses millions of dollars every year because of satellite piracy, and is forced to spend millions more in attempts to deter it. While the specific amount of loss may be impossible to determine, the Court is satisfied that it represents a serious threat

---

[10] While it may be argued that Congress spoke more directly regarding damages in satellite piracy cases in enacting 47 U.S.C. § 605(a) and its associated damages provisions, the Court is bound by the determination of the Ninth Circuit that Congress intended such conduct to also fall within the scope of section 2520. The Court must therefore ascribe to the Wiretap Act's statutory scheme a meaning that gives effect to the Ninth Circuit's interpretation.

14

to the satellite television industry--a threat Congress sought to combat, in part, through the Wiretap Act.

Because plaintiff has presented strong evidence of defendant's liability, while having also made a strong showing of harm, the Court finds that the threshold showing contemplated by section 2520(c)(2) has been established. Accordingly, the Court awards DirecTV $10,000 in statutory damages.

### 3. Attorneys' Fees

The Wiretap Act allows the Court to award plaintiff reasonable attorneys' fees and other litigation costs. 18 U.S.C. § 2520(b)(3). DirecTV requested $2,383.40 in attorneys' fees and costs in the present action in its original motion for default judgment. Plaintiff likely incurred additional fees and costs in making its presentation at the evidentiary hearing. However, because of the large number of DirecTV piracy lawsuits both before this Court and nationwide, the Court expects that the actual fees and costs per case would not be substantial. Moreover, in the interest of fairness, fees and costs incurred by DirecTV during prosecution of the present action should not all fall on the defendant in this action, but rather should be spread over all DirecTV piracy defendants. Therefore, the Court shall award attorneys' fees and costs, but shall reduce the amount requested to $2,000. See Shaver v. Shaver, 799 F. Supp. 576, 581 (E.D.N.C.) (award of damages under Wiretap Act is subject to court's discretion).

## C.  47 U.S.C. § 605(e)(4)

Because the complaint requests $20,000 in damages, the Court must also consider whether damages are appropriate under the other statutes under which relief is sought.

### 1. Liability

Section 605(e)(4) provides liability for:

> any person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or direct-to-home satellite services, or is intended for any other activity prohibited by subsection (a) of this section . . .

15

47 U.S.C. § 605(e)(4). According to DirecTV, this statute applies to defendant's conduct because use of the pirate access device entails programming or reprogramming a smart card or an emulator--conduct which plaintiff contends constitutes "modific[ation]" under the statute.[11] Several courts have rejected the notion that such allegations make out a claim under section 605(e)(4), finding instead that the provision only targets commercial activities such as manufacturing and distribution, and does not encompass the mere purchase of piracy equipment for personal use. See Carpenter, 2005 U.S. Dist. LEXIS 5124, *17 (citing cases).

The plain text of section 605 demonstrates that Congress sought to treat differently different participants in the market for piracy products. In contrast to section 605(e)(4), which focuses on manufacturers, importers and distributors of piracy equipment, section 605(a) targets individuals who illegally receive or assist in receiving a satellite signal. The statute does not place these two classes of conduct on the same footing. Instead, its damages provisions make available much larger civil remedies for violations of section 605(e)(4) than for 605(a). See 47 U.S.C. §605(e)(3)(C)(i)(II) (setting statutory damages range for violations of subsection (a) at $1,000-$10,000 and for subsection (e)(4) at $10,000-$100,000). Because all DirecTV pirates must reprogram a smart card or emulator in order to illegally receive DirecTV's signal, classifying such conduct under section 605(e)(4) would nullify the distinction built into the statute. Therefore, the Court finds that only section 605(a) applies to the conduct alleged in the complaint.

**D. 47 U.S.C. § 605(a)**

The Court need not reach the DirecTV's claims under this statute because plaintiff has requested that the Court award damages under section 605(a) only if damages are not

---

[11] DirecTV also argues that the insertion of a modified access card into a DirecTV receiver box is also conduct in violation of the statute because in constitutes "assembl[ing]." This reaches too far because it would render all use of piracy equipment as a violation of 605(e)(4). If insertion of a card into a receiver constitutes assembling, then so too must plugging the receiver into the wall, or attaching a cable from the receiver to a television, or perhaps even turning on the device. To so rule would be to totally destroy the distinction between 605(e)(4) and 605(a). Because the statute imposes two totally different damage regimes for those two statutes, the Court declines to do so. See 47 U.S.C. §605(e)(3)(C)(i)(II).

awarded under the other statutes. However, even if DirecTV had requested damages under this provision, the Court would still find such double recovery inappropriate.

## CONCLUSION

For the reasons stated above, the Court hereby enters default judgment in favor of plaintiff and against defendant. The Court hereby ORDERS that defendant Hoa Huynh pay to plaintiff DirecTV, Inc. damages in the amount of $10,000 and attorneys' fees and costs in the amount of $2,000.

**IT IS SO ORDERED.**

Dated: May 31, 2005

/s/
CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE